**SIGNED THIS: March 19, 2009**

_____

**THOMAS L. PERKINS**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**
_____

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MICHAEL E. LAHOOD and | ) | |
| ANNETTE M. WHITE LAHOOD | ) | No.  07-81727 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| HEARTLAND BANK AND TRUST | ) | |
| COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 07-8156 |
| | ) | |
| CHARLES E. COVEY, TRUSTEE, | ) | |
| RICHARD J. LAHOOD and FLLZ, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| CHARLES E. COVEY, TRUSTEE | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HEARTLAND BANK AND TRUST | ) | |
| COMPANY, | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |

CHARLES E. COVEY, TRUSTEE,                    )
                                              )
              Cross-Plaintiff,                )
                                              )
       vs.                                    )
                                              )
RICHARD J. LAHOOD, MICHAEL                    )
LAHOOD and FLLZ, L.L.C.,                      )
                                              )
              Cross-Defendant.                )
_____             )
                                              )
RICHARD J. LAHOOD                             )
                                              )
              Counter-Plaintiff,             )
                                              )
       vs.                                    )
                                              )
HEARTLAND BANK AND TRUST                      )
COMPANY and CHARLES E. COVEY,                 )
TRUSTEE,                                      )
                                              )
              Counter-Defendants.            )
_____             )
                                              )
FLLZ, L.L.C.,                                 )
                                              )
              Counter-Plaintiff,             )
                                              )
       vs.                                    )
                                              )
HEARTLAND BANK AND TRUST                      )
COMPANY and CHARLES E. COVEY,                 )
TRUSTEE,                                      )
                                              )
              Counter-Defendants.            )

## O P I N I O N

This matter is before the Court on the Motion filed by Heartland Bank and Trust

Company (HEARTLAND) for summary judgment on its complaint to determine validity,

priority and extent of liens; the Motion filed by the Defendant, Charles E. Covey, Trustee

(TRUSTEE), for summary judgment on his crossclaim; the Motion filed by Defendant,

2

FLLZ, L.L.C. (FLLZ), for summary judgment on HEARTLAND'S complaint, the TRUSTEE'S crossclaim and its counterclaims against HEARTLAND and the TRUSTEE; and the Motion filed by Richard J. LaHood (RICHARD) for summary judgment on HEARTLAND'S complaint, the TRUSTEE'S crossclaim and his counterclaims against HEARTLAND and the TRUSTEE.

The facts are not disputed.[1]  Michael E. LaHood (MICHAEL) and Richard J. LaHood were 50% members of FLLZ, L.L.C., a member-managed Illinois limited liability company.[2] The company's principal asset was a 337 acre parcel of real estate in Tazewell County, Illinois.  On January 5, 2006, MICHAEL executed a note in favor of RICHARD in the principal amount of $427,079.49, secured by a security agreement granting RICHARD a security interest in MICHAEL'S 50% interest in FLLZ.  The note is also secured by a mortgage executed by FLLZ, granting RICHARD a first mortgage lien on the real estate. The UCC Financing Statement, filed by RICHARD on January 24, 2006, contains no description of any collateral.

On January 20, 2007, HEARTLAND obtained a judgment by confession against MICHAEL and Annette M. LaHood (ANNETTE), his wife, in the amount of $301,447.01. MICHAEL and ANNETTE were served with a Citation to Discover Assets on March 20, 2007.  A motion to open the judgment was denied by the state court on May 22, 2007, without prejudice to the right to challenge the calculation of the amount due.

On August 9, 2007, MICHAEL and ANNETTE filed a voluntary petition under Chapter 7 of the Bankruptcy Code.  MICHAEL scheduled his one-half interest in FLLZ as

---

[1]The parties have filed a Stipulation of Facts.

[2]According to the Proof of Claim filed by RICHARD in the main case, at one time there were four members of FLLZ. The interests of the other two members were bought out by MICHAEL and RICHARD.

having no value. On that date, the balance due RICHARD on the note was $447,965.34,

consisting of principal of $427,079.49 and interest of $20,885.85.

On September 12, 2007, HEARTLAND filed a motion for relief from the automatic

stay, seeking to foreclose its judgment lien on the Debtors' personal property, including

MICHAEL'S membership interest in FLLZ. MICHAEL opposed the motion, asserting that

his membership interest was fully encumbered to RICHARD and that he had properly

claimed his interest as exempt. At the preliminary hearing on the motion, the TRUSTEE,

uncertain whether his rights were superior to HEARTLAND'S, sought additional time to

decide whether to exercise his avoidance rights or to abandon the bankruptcy estate's

interest.

On October 4, 2007, without first seeking stay relief, RICHARD executed a

Declaration of Dissolution of FLLZ, asserting that MICHAEL'S bankruptcy terminated his

membership interest. Electing not to continue the business, but to dissolve FLLZ and wind

up its business by distributing the real estate in equal shares to himself and to MICHAEL,

RICHARD caused FLLZ to execute quit claim deeds conveying a one-half interest to each

of them. The next day, RICHARD filed a motion for relief from the stay, seeking to

foreclose his mortgage against the real estate distributed to MICHAEL or to obtain a deed

in lieu of foreclosure from MICHAEL. MICHAEL objected to the motion, contending that

RICHARD'S action of dissolving FLLZ and conveying the real estate violated the automatic

stay and was null and void. Prior to the final hearing on the motions for relief from the

stay, HEARTLAND moved to withdraw its motion, asserting that it intended to file an

adversary proceeding to determine the validity and extent of liens on MICHAEL'S

membership interest in FLLZ. Conceding that he had used up his wildcard exemption in other assets, the objection to MICHAEL'S claim of exemption was allowed. RICHARD'S motion for relief from the stay was denied. The TRUSTEE filed a report of possible assets, disclosing that he intended to administer MICHAEL'S interest in FLLZ. RICHARD'S objection, premised upon the dissolution of FLLZ and the distribution of the real estate, was overruled by the Court.

On December 18, 2007, HEARTLAND filed a complaint against the TRUSTEE, RICHARD and FLLZ, to determine the validity, priority and extent of its lien in MICHAEL'S 50% membership interest in FLLZ.[3] In his answer to the complaint, the TRUSTEE alleged that the dissolution of FLLZ was in violation of the stay and void, and asserted that the estate's interest was not subject to a lien held by HEARTLAND. The TRUSTEE asserted a counterclaim against HEARTLAND, contending that its lien was voidable under Section 544(a)(1) and (a)(2). The TRUSTEE asserted a crossclaim against FLLZ, RICHARD and MICHAEL, alleging that under both state law and FLLZ'S Operating Agreement, he had the right to participate equally with RICHARD in winding up FLLZ; that RICHARD'S unilateral action in transferring the real estate in distribution of FLLZ'S assets after the filing of the petition and without Court approval, violated the stay and is void; and that RICHARD'S lien on MICHAEL'S membership interest was voidable pursuant to Section 544(a)(1) and (a)(2). FLLZ filed answers with counterclaims against HEARTLAND and the TRUSTEE, asserting that as a result of MICHAEL'S wrongful dissociation from FLLZ, the bankruptcy estate acquired only an economic interest in

---

[3]RICHARD'S motion to dismiss the complaint, alleging that HEARTLAND lacked standing to set aside a postpetition transfer of property by FLLZ to MICHAEL, was later withdrawn.

MICHAEL'S interest in FLLZ; that neither the TRUSTEE'S approval nor Court authorization was required for the distribution of MICHAEL'S interest in the real estate and sought a determination by the Court that its actions were proper. RICHARD also filed an answer to the complaint and to the TRUSTEE'S crossclaim, as well as counterclaims against HEARTLAND and the TRUSTEE, making the same assertions and adding that his security interest primes the judgment lien of HEARTLAND. HEARTLAND and the TRUSTEE each answered both the counterclaims filed by FLLZ and RICHARD, reasserting the allegations of their prior pleadings. MICHAEL failed to file a response to the TRUSTEE'S crossclaims and a default judgment was entered against him on June 4, 2008.

On February 6, 2008, the TRUSTEE filed a Notice of Compromise, setting forth his agreement with HEARTLAND that HEARTLAND'S lien is valid and perfected as to 80% of the value of the estate's 50% membership interest in FLLZ and is entitled to 80% of the proceeds generated from the winding up of FLLZ and that the bankruptcy estate is entitled to receive the remaining 20%. The Court has not approved the compromise, ruling that such determination should await the resolution of the adversary proceeding.

The parties filed a stipulation of facts, agreeing that the fair market value of the real estate on April 16, 2008, was $1,180,000. Based on their agreement as to the pertinent facts, the parties filed cross motions for summary judgment. RICHARD has conceded that he does not hold a perfected security interest in MICHAEL'S membership interest in FLLZ.

**STANDARDS FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7056, summary

judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to prevail on a motion for summary judgment, the moving party must establish there is no genuine issue of material fact as to any essential element of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a moving party has met its initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-movant to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial. Inferences to be drawn from underlying facts must be viewed in the light most favorable to parties opposing the motion. *In re Chambers*, 348 F.3d 650 (7th Cir. 2003). A material factual dispute is sufficient to prevent summary judgment only when the disputed fact is determinative of the outcome under applicable law. It is not the role of the trial court to weigh the evidence or to determine its credibility, and the moving party cannot prevail if any essential element of its claim for relief requires trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

When each side seeks summary judgment, that does not by itself indicate that there are no genuine issues of material fact. *In re Schreiber*, 163 B.R. 327, 331 (Bankr.N.D.Ill. 1994). While the court must ordinarily rule on each motion separately in determining whether or not each judgment should be entered, where both sides are proceeding on the same legal theory, it is likely that the material facts will not shift as the court considers each motion. *In re Sturman*, 222 B.R. 694 (Bankr.S.D.N.Y. 1998). When both parties are proceeding on the

same legal theory and on the same material facts, without dispute as to the inferences to

be drawn from those facts, the need for considering each motion separately disappears.

*See Schlytter v. Baker*, 580 F.2d 848 (5th Cir. 1978). With no disputed issues of material fact,

the sole question is whether the moving party is entitled to judgment as a matter of law.

*In re Big Idea Productions, Inc.*, 372 B.R. 388 (Bankr.N.D.Ill. 2007).

## OVERVIEW OF THE ILLINOIS LIMITED LIABILITY COMPANY ACT

The Illinois Limited Liability Company Act (ILLLCA), enacted in 1994 and codified

at 805 ILCS 180/1-1 *et seq.*, authorizes a hybrid form of business organization which

permits its members to avail themselves of tax benefits similar to a partnership and of

limited liability similar to the corporate form. *See Westmeyer v. Flynn*, 382 Ill.App.3d 952,

889 N.E.2d 671 (Ill.App. 1 Dist. 2008) (applying Delaware law). Embodying the principle

of freedom of contract, a limited liability company is primarily a creature of contract and

the limited liability company's operating agreement governs the conduct of its business

and the relations among the members, managers and company.[4] The provisions of the

ILLLCA serve as default provisions which govern a limited liability company in the

absence of controlling provisions in the articles of organization or written operating

agreement, subject to certain mandatory provisions. *R & R Capital, LLC v. Buck & Doe Run

Valley Farms, LLC*, 2008 WL 3846318 (Del.Ch. 2008); *OLP, LLC v. Burningham*, 185 P.3d 1138

(Utah App. 2008); *Kasten v. Doral Dental USA, LLC*, 301 Wis.2d 598, 733 N.W.2d 300 (Wis.

2007); *Overhoff v. Scarp, Inc.*, 12 Misc. 3d 350, 812 N.Y.S.2d 809 (N.Y.Sup. 2005). Thus, with

---

[4]As provided in Section 15-5(a), except as set forth in subsection (b), the operating agreement "may modify any provision or provisions of this Act governing relations among the members, managers, and company." Subsection (b)(4) provides that an operating agreement may not "restrict rights of a person, other than a manager, member, and transferee of a member's distributional interest, under this Act."

few exceptions, the operating agreement is a document of primacy that defines the rights, duties, power and authority of the members and managers, as among themselves. Only where the agreement is silent or ambiguous with regard to an issue, should guidance be sought in the provisions of the statute. *See* 805 ILCS 180/15-5(a).

A limited liability company may either be member-managed or manager-managed. Members have no property interest in the property owned by a limited liability company. 805 ILCS 180/30-1(a). A member may, however, transfer a distributional interest. 805 ILCS 180/30-1(b). Such a transfer entitles the transferee to receive the distributions which would have been made to the transferor, but does not entitle the transferee to become or to exercise any rights of a member, unless the operating agreement so specifies or all of the other members consent. 805 ILCS 180/30-5 and 30-10(a). Section 35-45 provides that a member is "dissociated" from a limited liability company upon the occurrence of certain events, including the filing of a petition in bankruptcy. 805 ILCS 180/35-45(7)(A). Dissociation terminates the member's right to participate in the management and conduct of the company's business, with the exception of participating in the "winding up" of the company's business, provided the member's dissociation was not wrongful. 180/35-55(b)(1). In addition, the member is stripped of his status as a "member," and is treated the same as a transferee of a member. *Id*. The dissociation of a member from a member-managed company is wrongful only if it is in breach of an express provision of the operating agreement. 180/35-50(b).

### SUMMARY OF FLLZ OPERATING AGREEMENT

FLLZ was engaged in owning, developing and managing real estate. Although FLLZ'S Operating Agreement provides that the members have the sole responsibility for

the management of the business, the authority to oversee all of the business activity

conducted on the company real estate is vested in RICHARD alone.[5]  According to Article

VI of the Operating Agreement, which governs the transfer of units, a member is required

to give notice first to the company and then to the members of any proposed transfer of the

member's units.  FLLZ is given the first right to purchase the units and in the event the

company fails to exercise that right, the individual members are afforded that opportunity.

Any or all of the remaining units subject to the proposed transfer, may then be transferred,

but unless the assignee of those units becomes a substituted member, the assignee acquires

only the right to receive the share of the profits and losses, distributions or returns of

capital to which the transferor would be entitled.  Unanimous consent is required in order

for an assignee to become a substituted member.[6]

Under Article VIII, governing transfers by operation of law, the Operating Agree-

ment also grants FLLZ the right to purchase a member's units upon the member's filing of

a bankruptcy petition or in the event of an attachment with respect to the member's units.

Paragraph 8.01 also provides:

> Failure of the Company to elect to purchase said Units under this Section 8.01
> shall not affect the rights of the Company and the other Members to
> purchase the same Units under ARTICLE VI in the event of any proposed
> subsequent sale, assignment, transfer, exchange, pledge, or other disposition
> thereof by or to any receiver, petitioner, assignee, administrator, transferee,
> or other person obtaining an interest in said Units.

The Operating Agreement also provides that the filing of a bankruptcy petition by a

member will cause the dissolution of the company, unless the remaining members agree

---

[5]The Operating Agreement provides that RICHARD'S authority includes, but is not limited to, the power to enter into hunting, crop-share, custom farm, or federal or state agricultural agreements, agreements for the purchase and application of chemicals, and agreements for the storage and/or sale of harvested crops.

[6]In addition, the assignor must give the assignee the right to become a member and the assignee must pay for all costs in connection with the substitution.

10

to continue the business of the company.  In the event of dissolution and liquidation, the

Operating Agreement provides that a "Majority in Interest of the Members" shall have the

right to wind up the affairs of the Company and to liquidate its investments, including the

unlimited discretion to determine the time, manner, and terms of any sale of property.

Unlike the ILLLCA, the Operating Agreement contains no language specifically addressing

dissociation of a member or the wrongful dissociation of a member.

**ANALYSIS**

The parties' positions have been thoroughly addressed in the motions, responses

and replies.  The following issues are presented therein:

1.  Whether HEARTLAND holds a first priority perfected lien on MICHAEL'S
membership interest in FLLZ;

2.  Whether the bankruptcy estate succeeded to only an economic interest in
MICHAEL'S distributive share of FLLZ;

3.  Whether MICHAEL'S dissociation from FLLZ was wrongful;

4.  Whether the TRUSTEE has the right to participate in the winding up of FLLZ'S
business;

5.  Whether RICHARD violated Sections 362(a)(3) and/or (a)(6) when he dissolved
FLLZ and caused it to execute quit claim deeds to himself and to MICHAEL; and

6.  Whether the distribution of the FLLZ real estate was proper.

In addition to these issues to which the parties devote most of their attention, it is the

Court's view that an additional one must be addressed first, as a threshold issue.  For the

most part, the position of FLLZ and RICHARD stands upon the foundational premise that,

through the doctrine of merger, the mortgage to RICHARD is payable in full from

MICHAEL'S half interest.  If, as a matter of law, that premise is false, the arguments that are

built upon it are a house of cards.  In the Joint Memorandum of Law filed on behalf of FLLZ

11

and RICHARD, while making the argument that the doctrine of merger applies, they state that "this issue is not before the Court at this time."  Document 58, pp. 8-9.  The Court disagrees.  Whether a merger did or did not occur directly affects how much of the value of the real estate will be available for distribution to creditors in this bankruptcy case.

The numbers tell the story.  Based upon the agreed value of the real estate of $1,180,000, if it had been first sold by FLLZ for that amount, after payment of the mortgage indebtedness of $476,323, and capital gains taxes of $91,080 generated by the sale, RICHARD and the TRUSTEE would each have been entitled to a distribution of $306,298. In contrast, by distributing the real estate in kind subject to the mortgage, and assuming, *arguendo*, that a merger washed RICHARD'S half clean of the mortgage, the entire amount of the mortgage balance of $476,323 will be paid from the proceeds of the estate's one-half interest, presumed to be $590,000, resulting in substantially reduced funds for the estate.[7]

**No Merger Occurred**

The purpose of RICHARD'S precipitous actions is spelled out in the Joint Memorandum of Law filed on behalf of him and FLLZ in support of their motion for summary judgment.  Apparently realizing that MICHAEL'S bankruptcy filing would mean that the mortgage, as a charge against the whole parcel, would be treated as an incumbrance against his half interest as well as MICHAEL'S half, RICHARD attempted to avoid that result by engineering a merger of the mortgage into his yet to be acquired ownership interest.[8]  Throwing caution to the wind by ignoring the automatic stay, RICHARD took

---

[7]The parties do not address the tax consequences of a distribution in kind.

[8]RICHARD must have also been aware that his security interest in MICHAEL'S distribution rights in FLLZ was unperfected and avoidable by MICHAEL'S bankruptcy trustee.

action on October 4, 2007, to unilaterally dissolve FLLZ and to issue and record quit claim deeds purporting to convey, to himself and to MICHAEL, respectively, "an undivided one-half interest" in the FLLZ real estate.

In their Memorandum, RICHARD and FLLZ contend that the mortgage in favor of RICHARD, merged into his ownership interest acquired via the quit claim deed from FLLZ to him, but that it continues to encumber MICHAEL'S (i.e., the bankruptcy estate's) one-half interest, with RICHARD owning his half free and clear.

That theory, while perhaps facially appealing, is fatally flawed in at least two respects. Illinois courts recognize the equitable doctrine of merger which, under certain circumstances, can cause the extinguishment of a mortgage lien upon acquisition by the mortgagee of the mortgagor's title and equity of redemption. *Downstate Nat. Bank v. Elmore,* 224 Ill.App.3d 1075, 1081, 587 N.E.2d 90 (Ill.App. 5 Dist. 1992). One of the requirements, however, is that the mortgagee receive full title to the encumbered parcel; partial ownership is insufficient. This principle is concisely summarized as follows:

> A limitation upon the doctrine of merger in the case of a conveyance of mortgaged property to the mortgagee is that one estate will not absorb the other unless the two estates are coextensive or commensurate, and if a person having a mortgage on an entire tract of land acquires a title to such land, less extensive and comprehensive than his or her mortgage title, there can be no merger. Thus, if the mortgagee of an entire tract receives a deed to the equity of redemption in an undivided half interest in the land, his or her mortgage will not merge in the title so acquired. Similarly, a merger is not effected by the holder of a part of a mortgage buying the equity of redemption.

55 Am. Jur. 2d Mortgages § 1351, citing *Mann v. Mann,* 49 Ill.App. 472, 1893 WL 2035 (Ill.App. 2 Dist. 1893). *See, also, Ellis v. McClung,* 291 Ill.App.3d 448, 460, 683 N.E.2d 911

13

(Ill.App. 1 Dist. 1997) (the two estates must be identical in duration, quality, and all other circumstances of right).

The mortgage on the FLLZ real estate encumbers the fee simple interest while the quit claim deed to RICHARD conveyed only a one-half interest. Because the two estates are not coextensive, the doctrine of merger cannot apply.

The application of the doctrine of merger to achieve the result sought by RICHARD is conceptually implausible as well. Fundamentally, the effect of a merger, when it operates as a lien voiding mechanism, is to cause an extinguishment or cancellation of the mortgage indebtedness. *Matter of Estate of Ozier,* 225 Ill.App.3d 33, 36, 587 N.E.2d 77 (Ill.App. 4 Dist. 1992); *Olney Trust Bank v. Pitts,* 200 Ill.App.3d 917, 925, 558 N.E.2d 398 (Ill.App. 5 Dist. 1990). Under the application of the doctrine advocated by RICHARD, no portion of the mortgage debt is cancelled. Instead, the entire debt migrates from the whole of the property to the half, undivided though it is, now owned by MICHAEL. There is no precedent for this inventive theory which is contrary to one of the doctrine's most basic elements.

Ordinarily, FLLZ'S distribution of the real estate in kind would have been achieved through a single deed conveying title to RICHARD and MICHAEL as tenants in common. RICHARD'S contorted use of two separate deeds may have been a desperate attempt to obtain the appearance of coextensiveness. Alternatively, it may have been done in the fear that a single deed would cause the extinguishment of the entire mortgage debt through merger. Either way, RICHARD'S use of two deeds is reflective of the theoretical difficulty of trying to fit the square peg of his joint ownership with MICHAEL into the round hole of the doctrine of merger.[9]

---

[9]Even if the deeds issued by FLLZ were valid, RICHARD and MICHAEL are nothing more or less than tenants in common, the same as if a single deed had been used. *See* 765 ILCS 1005/1.

**In Kind Distribution Was Invalid**

Apart from whether the doctrine of merger provides RICHARD the result he wants, it is a separate issue whether the distribution of the real estate in kind was validly made and is not subject to challenge.  HEARTLAND and the TRUSTEE, while not objecting to the dissolution of FLLZ, seek to undo the "winding up" of FLLZ by setting aside the distribution of the real estate. The TRUSTEE and HEARTLAND contend that RICHARD lacked the right to unilaterally wind up FLLZ'S business.  Both RICHARD and FLLZ, maintaining that the TRUSTEE is not entitled to participate in the distribution of FLLZ'S assets and that court authorization was not required to be obtained before the distribution was made, seek an order declaring that the distribution of the FLLZ real estate was proper.[10] It is not necessary to resolve the complex issues relating to whether the noneconomic interest of MICHAEL became property of the estate or whether RICHARD had the right to unilaterally wind up FLLZ.  These issues are mooted by the fact that RICHARD'S dealings with the real estate were improper and invalid as a matter of state law.

The Illinois statute, like that of several other jurisdictions, mandates that assets must first be applied to discharge the claims of creditors, including members who are creditors, before any "surplus" is distributed to members.[11] Section 35-10, governing the distributions of assets in winding up the business of an LLC, provides as follows:

> (a) In winding up a limited liability company's business, the assets of the company must be applied to discharge its obligations to creditors, including members who are creditors.  Any surplus must be applied to pay in money

---

[10]While RICHARD and FLLZ may only have sought a determination that the distribution of the real estate was procedurally proper, this Court does not regard the inquiry as so constrained.

[11] 805 ILCS 180/35-10; HRS Section 428-806 (Hawaii); I.C.A. Section 489.708 (Iowa); Code 1978 Section 33-44-806 (South Carolina); SDCL Section 47-34A-806 (South Dakota); 13 V.I.C. Section 1806 (Virgin Islands); 11 V.S.A. Section 3106 (Vermont).

the net amount distributable to members in accordance with their right to distributions under subsection (b) of this Section.

(b) Each member is entitled to a distribution upon the winding up of the limited liability company's business, consisting of a return of all contributions that have not previously been returned and a distribution of any remainder in equal shares.[12] (Footnote added).

Paragraph 12.03 of FLLZ'S Operating Agreement, which specifically addresses the distributions to be made in liquidation, incorporates the rule that creditors must be paid first. That paragraph provides:

Upon the dissolution of the Company, a Majority in Interest of the Members shall proceed to the liquidation of the assets of the Company by distributing its assets in kind, or by converting said assets to cash and distributing the proceeds thereof, in the following order of priority:

(a) Creditors/Reserve. First, to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Company other than liabilities of the Company for distribution to Members pursuant to Section 4.01 or ARTICLE IX. To satisfy such obligations to creditors a Majority in interest of the Members may cause the Company to fund any reserves which a Majority in Interest of the Members may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company. Said reserves may be paid over by the Company to an escrow agent designated by a Majority in Interest of the Members to be held by said escrow agent for the purpose of disbursing said reserves in payment of any of the aforementioned contingencies, and at the expiration of any such period as a Majority in Interest of the Members may deem advisable, said escrow agent shall distribute the balance thereof then remaining in the manner hereinafter provided.

---

[12] While the whole of Section 35-10 is not controlling where the governing operating agreement contains provisions governing the order of distribution, any obligations to outside creditors must always be paid first. Section 180/15-5(b)(4) prohibits an operating agreement from "restrict[ing] rights of a person, other than a manager, member, and transferee of a member's distributional interest, under this Act." If an operating agreement provided, for example, that creditors' payment rights were subordinated to distributional rights of members, such a provision would undoubtedly be unenforceable.

   (b) <u>Certain Obligations to Members.</u>      Second, to
Members and former Members in satisfaction of the Company's
obligations for distributions due and owing under Section 4.01
and ARTICLE IX.

   (c) <u>Distributions to Members.</u>   Third, to the Members
having positive capital account balances to the extent of, and in
proportion to, such positive capital account balances; and the
balance (if any) shall be distributed to the Members in
proportion to the number of Units Owned by each Member.

Paragraph 12.04, addressing distributions made in kind, provides:

Upon the dissolution of the Company, any unsold Company property that is
to be distributed in kind to the Members and not sold shall be valued (as of
the date of such distribution) to determine the gain or loss that would have
resulted if such property were sold, and the capital accounts of the Members
shall be adjusted to reflect how such gain or loss would have been allocated
under ARTICLE III, if such property had been sold at the assigned value.
Such unsold property is then to be distributed in accordance with Section
12.03(c), with reference to its assigned value.  If all of the Members cannot
agree in writing as to the value to be assigned to unsold Company property
and the Member or Members to whom such unsold Company property shall
be distributed, all such unsold Company property shall be distributed pro-
rata in accordance with the number of Units owned.

   The requirements of the Operating Agreement are clear.  It requires assets to be first applied to discharge obligations of creditors of FLLZ, including creditors who are also members of FLLZ.  The mortgage owing to RICHARD was required to be satisfied before a distribution could be made to members on account of their distributive share.[13]   The Operating Agreement makes no provision for in kind distributions of encumbered assets. Unquestionably, RICHARD, in an attempt to favor himself, caused FLLZ to convey the real estate to himself and MICHAEL, in equal shares, without first providing for satisfaction of the mortgage indebtedness.  That distribution violates the provisions of the Operating Agreement and the ILLLCA, and must be declared void.

---

[13]HEARTLAND noted this point in its brief.

17

**Automatic Stay Was Violated**

Turning to the issue of whether RICHARD'S actions violated the automatic stay, it is clear that the issuance and recording of the quit claim deeds violated the stay as an "act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6).

The automatic stay is designed to effect an immediate freeze of the status quo at the outset of a bankruptcy case, by precluding and nullifying most postpetition actions and proceedings against the debtor in nonbankruptcy fora, judicial or nonjudicial, as well as most extrajudicial acts against the debtor, or affecting property in which the debtor, or the estate, has a legal, equitable or possessory interest. *I.C.C. v. Holmes Transp., Inc.*, 931 F.2d 984, 987 (1st Cir. 1991). Judicial actions and proceedings, as well as extrajudicial acts, in violation of the automatic stay, are generally void and without legal effect, unless the stay is subsequently annulled by court order. *Id.* at 987-88.

While it is certainly true that the automatic stay is intended to give the debtor a breathing spell from creditor collection activity, the stay's second major purpose is to prevent one creditor from taking postpetition action to gain an advantage over other creditors. *In re Just Brakes Corporate Systems, Inc.*, 108 F.3d 881, 884 (8th Cir. 1997); *Martin-Trigona v. Champion Federal Sav. and Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989); *In re Lyckberg*, 310 B.R. 881, 890 (Bankr.N.D.Ill. 2004).

Section 362(a)(1) pertains to court and other legal actions and proceedings prosecuted or conducted against a debtor and is not applicable to the acts taken by RICHARD on October 4, 2007, which were extrajudicial. The preclusion of extrajudicial collection activity

is set forth in Section 362(a)(6) where the use of the term "any act" is the broadest possible reference.

RICHARD admits that MICHAEL owed him a debt in excess of $400,000 secured by a mortgage on FLLZ'S real estate, and that the debt arose before MICHAEL'S bankruptcy filing.  The issue is whether the issuance of the quit claim deeds on October 4, 2007, was an act to collect, assess, or recover that claim.  RICHARD and FLLZ acknowledge that the purpose of the deeds was to effect a merger so that the mortgage would be payable solely from MICHAEL'S half interest in the real estate.  In other words, the intent was to orchestrate the payment of the mortgage only from MICHAEL'S property interest, not from the interest conveyed to RICHARD, a result that would have been financially favorable to RICHARD and financially unfavorable to the estate and the creditors.

The fact that the issuance and recording of the deeds, by itself, put no money in RICHARD'S pocket gives the Court no pause.  It was a clear, affirmative step in that direction.  Those actions were admittedly done by RICHARD for the purpose of structuring his mortgage claim so as to maximize his ultimate recovery at the expense of MICHAEL'S other creditors.  There is no contrary inference to be drawn.  Issuance and recording of the deeds by RICHARD were acts to collect, assess or recover his claim against MICHAEL, that were intended to work a financial detriment on the bankruptcy estate and, thus, on creditors entitled to be paid from the estate.  As such, RICHARD'S actions were in violation of the automatic stay and the deeds are determined to be void and of no effect.[14]

---

[14]Having determined that a stay violation occurred under Section 362(a)(6), it is unnecessary to address the alternative arguments that a violation also occurred under Section 362(a)(3).

**MICHAEL'S Dissociation Was Not Wrongful**

The TRUSTEE and HEARTLAND rely upon Section 35-4 of the ILLLCA, which provides that a member who has not wrongfully dissociated may participate in winding up a limited liability company's business. FLLZ and RICHARD contend that by filing a bankruptcy petition, MICHAEL wrongfully dissociated from FLLZ. FLLZ and RICHARD mistakenly assert that the Operating Agreement provides for the dissociation of a member upon the filing of a bankruptcy petition. The Operating Agreement does not address dissociation.[15]

Relying upon Section 35-50 of the ILLLCA, which provides that a member's dissociation is wrongful only if it is in breach of an express provision of the operating agreement, FLLZ and RICHARD contend that MICHAEL'S dissociation violated (1) Section 6.01 of the Operating Agreement which requires a member to give written notice to the company before transferring any interest in the company; and (2) Section 6.05 of the Operating Agreement which provides that an assignee shall not become a substituted member unless all of the remaining members consent. The contention of FLLZ and RICHARD that MICHAEL violated the terms of the Operating Agreement when he failed to give notice of his impending bankruptcy, conflates the notice provisions of Article VI, the general transfer provision, with Article VIII, governing transfers by operation of law including, specifically, a transfer resulting from a member's bankruptcy filing.

Article VI deals with situations where a member proposes to make a sale, gift, pledge or other voluntary transfer of his Units. Where a voluntary transfer is contemplated, FLLZ

---

[15]FLLZ'S Operating Agreement was amended and restated on January 5, 2006. The date that it was first formed is not of record. The provisions governing the dissociation of a member were added to the ILLLCA in 1998. P.A. 90-424. With minor changes not significant here, Paragraph 12.01 of Article XII, governing dissolution and liquidation , tracks the predecessor provision. "Dissociation," then, is a statutory concept that was not expressly adopted by FLLZ.

under Section 6.01, and the other members under Section 6.02, have rights of first refusal to purchase the Units proposed to be transferred.  In order to protect those rights, the transferring member is required to give advance notice of the proposed transfer.

Article VIII, on the other hand, deals with transfers by operation of law and contains no advance notice obligation.  In the event of a member's bankruptcy, Section 8.01 gives FLLZ an option to purchase the member's Units during the 90-day period following receipt of written notice of the bankruptcy, which notice can only be given after the bankruptcy filing.

Under the terms of the Operating Agreement, MICHAEL'S bankruptcy filing is an event that is expressly governed by Article VIII, not Article VI.  The advance notice requirement set forth in Article VI is simply not applicable here.  Accordingly, the argument of RICHARD and FLLZ that MICHAEL'S dissociation was wrongful because he failed to give advance notice of his bankruptcy filing has no merit.

Their alternative argument, that the dissociation was wrongful because RICHARD did not consent to the TRUSTEE becoming a substituted member as required by Section 6.05, suffers from similar infirmities.  Because Article VI is not applicable in the event of a member's bankruptcy, Section 6.05 is not applicable.  Apart from its general inapplicability, Section 6.05 deals specifically with the conditions that must be satisfied before an assignee of a Unit may become a substituted member, and includes the condition that the assignor give the assignee such right.

The TRUSTEE, however, is not MICHAEL'S assignee.  MICHAEL has made no assignment of his interest to the TRUSTEE.  To the extent the TRUSTEE becomes a substitute

for MICHAEL, that transition occurs by operation of law, not because MICHAEL assigns his interest or status.  Section 541(a)(1) provides that the commencement of a bankruptcy case creates an estate comprised of all legal or equitable interests of the debtor in property as of the commencement of the case.[16]  Without the occurrence of an assignment, Section 6.05 is immaterial and the argument made by RICHARD and FLLZ that depends upon its applicability is not meritorious.

Furthermore, their assessment that the "transfer" to the TRUSTEE, not made according to the terms of the Operating Agreement, is thereby voided under Article XI, completely ignores Section 8.01, which expressly contemplates and provides for the event of a member's bankruptcy and the resulting involuntary transfer by operation of law. MICHAEL'S dissociation, caused by his bankruptcy filing, was not in breach of any express provision of the Operating Agreement and, therefore, was not wrongful under Section 35-50 of the ILLLCA.

**HEARTLAND'S Lien is Invalid**

In its Motion for Summary Judgment and accompanying Memoranda, HEARTLAND claims that it obtained a lien on MICHAEL'S membership interest in FLLZ in March, 2007, when it served MICHAEL with a Citation to Discover Assets.  A judgment creditor that properly serves a citation on the judgment debtor obtains a lien "upon all personal property belonging to the judgment debtor in the possession or control of the judgment debtor or which may thereafter be acquired or come due to the judgment debtor to the time of the disposition of the citation."  735 ILCS 5/2-1402(m)(1).  Since MICHAEL'S interest in FLLZ

---

[16]The bankruptcy estate has been characterized as a legal fiction which serves as a repository of assets.  *Bland v. Farmworker Creditors*, 308 B.R. 109, 111-12 (S.D.Ga. 2003).  Its existence is both temporary and for a narrowly prescribed purpose: the extraction of value from those assets and the distribution of that value to holders of claims in accordance with the priority scheme established in the Bankruptcy Code.

is personal property and the Citation was not discharged, argues HEARTLAND, it obtained

a lien against that interest to the extent of its judgment balance, which lien existed on the

petition date and is not avoidable as a preference since the Citation was served more than

90 days before the petition was filed.  Ordinarily, HEARTLAND'S position would be solid,

but this case is far from ordinary.

HEARTLAND'S position is contrary to Section 30-20 of the ILLLCA, which sets forth

the procedure that a judgment creditor of a member must follow in order to execute the

judgment against a member's distributional interest in a limited liability company.[17]

Section 30-20 provides, in part:

> (a) On application by a judgment creditor of a member of a limited
> liability company or of a member's transferee, a court having jurisdiction may
> charge the distributional interest of the judgment debtor to satisfy the
> judgment.  The court may appoint a receiver of the share of the distributions
> due or to become due to the judgment debtor and make all other orders,
> directions, accounts, and inquiries the judgment debtor might have made or
> which the circumstances may require to give effect to the charging order.

> (b) A charging order constitutes a lien on the judgment debtor's
> distributional interest.  The court may order a foreclosure of a lien on a
> distributional interest subject to the charging order at any time.  A purchaser
> at the foreclosure sale has the rights of a transferee.

Most significantly, the charging order procedure is the judgment creditor's sole remedy.

Section 30-20(e) provides:

> (e) This Section provides the exclusive remedy by which a judgment
> creditor of a member or a transferee may satisfy a judgment out of the
> judgment debtor's distributional interest in a limited liability company.

In support of its position that a citation lien attaches to a judgment debtor's

---

[17]Despite extensive briefing, none of the parties referenced Section 30-20.  The Court assumes the parties were simply unaware of it.  Because that section controls, as a matter of law, the disposition of the disputed issue of HEARTLAND'S claim of a Citation lien, the Court believes it has a duty to raise it *sua sponte,* and to decide the issue based upon the applicable statute, even though overlooked by the litigants.

membership interest in a limited liability company, HEARTLAND relies upon *Dowling v. Chicago Options Associates, Inc.,* 365 Ill.App.3d 341, 847 N.E.2d 741 (Ill.App. 1 Dist. 2006). In that case, a judgment creditor petitioned the circuit court under Section 2-1402(e) of the Code of Civil Procedure for an order compelling the judgment debtor to turn over his ownership interest in, among other things, two limited liability companies directly to the creditor, which the circuit court granted. The appellate court reversed this ruling, determining that Section 2-1402(e) required that turnover be made to the sheriff for public sale. The judgment debtor, who was not in bankruptcy, conceded that his membership interests were subject to the creditor's actions, contending only that a sheriff's sale was required. 365 Ill.App.3d at 354. No argument was raised concerning Section 30-20 of the ILLLCA and the appellate court made no reference to that provision. *Dowling* does not hold that Section 30-20 is not the exclusive remedy for a judgment creditor who seeks payment through or on account of a judgment debtor's interest in a limited liability company. *Dowling* must be limited to its facts and to the narrow issue before it. This was recognized by the district court in *Bobak Sausage Co. v. Bobak Orland Park, Inc.,* 2008 WL 4814693 (N.D.Ill. 2008), characterizing Section 30-20 as contradicting *Dowling, Id.* at *5, and ordering the parties to show cause why a receiver should not be appointed as contemplated by Section 30-20(a).

In this Court's view, the unambiguous term "exclusive remedy" must be interpreted as meaning "to the exclusion of all other remedies." It cannot be interpreted as meaning "in addition to other remedies." Section 30-20(e) forecloses the possibility that the lien obtained via a charging order is simply another alternative to a citation lien. Exclusive means exclusive. The lien provided in Section 30-20(b), conditioned upon entry of a charging order,

is the only one available to a creditor seeking to attach or enforce a judgment against the interest of a member in an Illinois limited liability company.  The Court determines that HEARTLAND did not obtain a lien that attached to MICHAEL'S interest in FLLZ when it served him with a Citation to Discover Assets in March, 2007.[18]

**Judicial Supervision**

This Court's determination that the in kind distribution of the FLLZ real estate was not valid and is void, both as a matter of state law and bankruptcy law, frees the TRUSTEE to seek judicial supervision of the liquidation and distribution of assets.  The TRUSTEE relies on Section 35-4(a) of the ILLLCA which provides for judicial supervision of the winding up.  That section provides:

> (a)   After dissolution, a member who has not wrongfully dissociated may participate in winding up a limited liability company's business, but on application of any member, member's legal representative, or transferee, the Circuit Court, for good cause shown, may order judicial supervision of the winding up.

The TRUSTEE, as MICHAEL'S transferee by operation of law, has standing to apply for judicial supervision of the winding up, as does RICHARD as the remaining member.[19] Moreover, since the winding up process will determine the value to be paid to the estate, a determination squarely within the TRUSTEE'S duties, it only makes sense that the TRUSTEE participate in that process.

---

[18]Notwithstanding the proposed compromise between HEARTLAND and the TRUSTEE, HEARTLAND'S claim of lien continued to be disputed and opposed by FLLZ and RICHARD.  Having determined that HEARTLAND did not obtain a lien through service upon MICHAEL of a Citation to Discover Assets, it is not necessary to address the arguments of FLLZ and RICHARD that the Citation lien was precluded by the terms of the Operating Agreement or that the Citation lien was not properly perfected.  The Court sees no reason, however, why service of the Citation would not give rise to a valid lien against other personal property owned by MICHAEL.

[19]A transferee of a member's interest has the right to petition a court for an order compelling the dissolution and winding up of a limited liability company on equitable grounds.  805 ILCS 180/35-1(5).  Since FLLZ is dissolved and only the mechanics of the winding up process need be established, judicial supervision under Section 35-4 is the appropriate remedy, if necessary.

The quit claim deeds having been declared void, title to the real estate remains in FLLZ. The winding up process contemplates sale of the real estate, payment of the mortgage and any taxes, as well as any other debts of FLLZ, and equal distribution of the excess proceeds to RICHARD and the bankruptcy estate. This may be accomplished consensually, without judicial supervision. If the TRUSTEE and RICHARD cannot agree on the winding up process, including the terms under which the real estate will be sold, either may seek judicial supervision.

**Disapproval of the Trustee's Compromise**

Shortly after the filing of the adversary proceeding, the TRUSTEE and HEARTLAND agreed to compromise HEARTLAND'S claim of secured status based on its service of a citation to discover assets on MICHAEL on March 29, 2007, prior to the filing of the bankruptcy petition. By the terms of the settlement, the TRUSTEE and HEARTLAND seek entry of an order declaring that HEARTLAND has a valid, perfected lien on 80% of the bankruptcy estate's membership interest in FLLZ, or the proceeds thereof, and that the TRUSTEE is entitled to receive the remaining 20% free and clear of any lien of HEARTLAND. The Court declined to approve the settlement, determining that it was premature to assess the terms of the settlement until the issues in the adversary proceeding between the TRUSTEE and RICHARD and FLLZ were resolved.

The paramount consideration in determining whether a bankruptcy settlement should be approved is whether it is in the best interests of the estate. *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421 (7th Cir. 2007). That determination calls for a comparison of the settlement's terms with the litigation's probable costs and likely benefits. *Id.; In re Commercial Loan Corp.*, 316 B.R. 690 (Bankr.N.D.Ill. 2004). Factors to be considered in determining

whether to approve a proposed compromise include the probability of success in the

litigation, the complexity of the litigation involved and the expense, inconvenience and delay

surrounding it. *In re Resource Technology Corp.*, 330 B.R. 654 (N.D.Ill. 2005). The court must

make an informed, independent judgment that the compromise is fair and equitable.

*Depoister v. Mary M. Holloway Foundation*, 36 F.3d 582 (7th Cir. 1994). The court in *Commercial*

*Loan Corp.*, clarifying the court's role, stated:

> [T]he court need not–indeed, should not–decide the merits of the
> dispute. *Energy Co-op.*, 886 F.2d at 927 n. 6. On the other hand, the court must
> do more than note that the trustee "considered" particular claims. *See Am.*
> *Reserve Corp.*, 841 F.2d. at 163 (reversing settlement approval where
> bankruptcy court had merely taken note of what the trustee "considered").
> The court's appropriate role lies between these extremes. The court should
> "canvass the issues," *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136
> F.3d 45, 51 (1st Cir. 1998)(internal quotation omitted), for the purpose of
> assessing the strength of the claims the trustee wants to surrender. *Am. Reserve*
> *Corp.*, 841 F.2d at 161-62.

> There is a similar middle ground when it comes to how critically the
> court should scrutinize the trustee's settlement decision. The court cannot
> simply "rubber stamp" the decision and must do more than take the trustee's
> word that the decision is reasonable. *Energy Co-op.*, 886 F.2d at 924. At the
> same time, settlement decisions are judgment calls. They are not "scientific,"
> *In re Apex Oil Co.*, 92 B.R. 847, 867 (Bankr.E.D.Mo. 1988), or subject to any
> "rigid mathematical formula," *Energy Co-op.*, 886 F.2d at 928, and they cannot
> be evaluated in "balance sheet" fashion, *id; In re Lee Way Holding Co.*, 120 B.R.
> 881, 899 (Bankr.S.D.Ohio 1990). Some deference, then, must be given to the
> trustee's expertise. *Healthco*, 136 F.3d at 50 n. 5; *In re Eastwind Group, Inc.*, 303
> B.R. 743, 750 (Bankr.E.D.Pa. 2004). Only if the settlement "falls below the
> lowest point in the range of reasonableness" should the trustee's decision be
> disturbed. *Energy Co-op.*, 886 F.2d at 929 (internal quotation omitted);
> *Telesphere*, 179 B.R at 553.

The unusual posture here is that the issue that was the subject of the proposed

settlement has now been decided. Although the wisdom of a wager is obvious after the race

has been run, the Court does not have the luxury of employing such a simplistic

methodology. Whether the proposed settlement falls below the lowest point in the range of

reasonableness, should be measured from the perspective of a hypothetical trustee who fully understands the issues and who is fully informed about the law that applies to those issues.

The settlement was reached quite early in the litigation, well before the pleadings were even settled or the issues fully identified. Yet it did little, if anything, to foreshorten the litigation. The issue that was its subject, whether HEARTLAND obtained a valid, unavoidable lien on MICHAEL'S interest in FLLZ through serving him with a Citation to Discover Assets, remained in dispute between HEARTLAND and FLLZ and RICHARD.

Significantly, the inquiry into reasonableness is an objective one, not a subjective one. Presumably, the proposed settlement appeared subjectively reasonable to the TRUSTEE at the time he agreed to it. No doubt, if he hadn't thought it reasonable for the estate to receive only 20% of MICHAEL'S half of the real estate's value, he wouldn't have accepted it. But to ask what he thought about the settlement and more importantly, what information and rationale it was based upon, does not advance the inquiry.

It is apparent that the TRUSTEE was not aware of ILLLCA Section 30-20 when the settlement was reached. Yet that oversight, which made the compromise seem subjectively reasonable, must be ignored for purposes of this evaluation. Obviously, the Court is not bound by a mistake of law that colored the TRUSTEE'S perception. Rather, the Court is required to evaluate the settlement in light of Section 30-20, which states the law applicable to the disputed issue.

The proper question is whether the proposed compromise is within the range of reasonableness given that Section 30-20 sets forth the exclusive procedure for a judgment creditor to obtain and enforce a lien on the economic value that flows from membership in

28

a limited liability company.  In this Court's view, a 20/80 split with a creditor claiming a lien through some other procedure falls well below the lowest point in the range of reasonableness.[20]  Accordingly, the proposed compromise cannot be approved.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate Order will be entered.

### 

---

[20]It is not necessary for the Court to identify precisely the low point in the range of reasonableness.  In view of the clarity of Section 30-20, however, the proposed compromise is not even close to being reasonable.  The major factor that justifies a compromise at all, is that neither the Illinois Supreme Court, nor any other court, has published an opinion construing Section 30-20(e).